MONCURE, J.,
delivered the opinion of the court:
The court is of opinion, that the Circuit court did not err in overruling the demurrer to the indictment. The only question which seems to be raised, or intended to be raised by the demurrer, is, Whether, in an indict- *594 anent for murder, the offence should'be described in the terms used in the statute defining murder in the first degree. This identical question was raised by the demurrer to the indictment in Bivingston’s Case, decided during the present term of this court, supra 592; and it is only necés-sary to refer to the opinion delivered by Judge Daniel in that case, for the reasons of the court for sustaining the judgment of the Circuit court in overruling the demurrer in this case.
The court is further of opinion, that the Circuit court did not err in overruling the objection of the prisoner to the introduction of the dying declarations of the deceased as evidence. The alleged ground of the objection is, that no sufficient foundation for their introduction had been laid. The rule of law on this subject is now well settled, that to render dying declarations admissible evidence, they must be shown to have been made when the declarant is under a sense of impending death, and without any exrectation or hope of recovery. Whether so made or not, is a preliminary question to be determined by the court on all • the circumstances of the case'. • See 2 Russ, on Crimes 752-767; Vass’ Case, 3 Leigh 786; Hill’s Case, 2 Gratt. 594. There is no difficulty in the application *of the rule of law just stated to the circumstances of this case; which are fully set forth in the first bill of exceptions. According to the facts as stated by the Reverend Mr. Moore, there can be no doubt of the admissibilitj' of the evidence. The declarations were made in about an hour before the declarant’s death, on being informed of the opinion of his physicians that he could not possibly recover, and when all his acts and words indicate that he had not the slightest ho,pe of recovery. There is some variance between the facts as stated by that witness, and as stated by the witness Tyler. If the variance were material, we would have to regard that statement as true which would sustain the judgment of the Circuit court. But the variance is immaterial. When the deceased first made the declarations, according to the evidence of Tyler, he may possibly have had some faint hope of recovery. But if he had, it must have been utterly extinguished by the information subsequently received from his physicians, through Mr. Moore, that he was certainly dying, and would die very soon. After he received that information, he repeated or reaffirmed the declarations; which made them competent evidence, if they would not otherwise have been so.
The court is further of opinion, that the Circuit court did not err in overruling the .motion of the prisoner to set aside the verdict, upon the ground that it was contrary to 'law and evidence. The bill of exceptions states the evidence of the witnesses examined on the trial, instead of the facts appearing to the court to be proved by such evidence. See Vaiden’s Case, 12 Gratt. 717. This court cannot therefore, according to our well settled rule on the subject, take cognizance of the case and reverse the judgment, unless, by rejecting all the parol evidence for the exceptor, and giving full force and credit to that of the adverse party, the decision of the court below' still appears to *be wrong. Id. and the cases therein cited. Applying that rule to this case, it certainly does not appear that the decision is wrong; or at least that there is any error therein to the prejudice of the prisoner.- Full force and effect must, according to that rule, be given to the dying declarations as proved by Tyler, that the prisoner struck and kicked the deceased without provocation, and for no cause except that the prisoner and those who joined him in the affray said the deceased had talked about a young lady in Haley’s house, which the deceased said he had never done: and also to the evidence of two of the brothers of the deceased, who proved that the prisoner said he did kick the deceased, and intended and tried to kill him. Regarding these as facts, and taking them in-connection with the other evidence of the commonwealth regarded in the same way, the prisoner was certainlj' guilty of voluntarj' -manslaughter at least. But the result will not be varied, even if the objection to the form of the bill of exceptions be disregarded, and all the evidence therein set forth, as well for as against the prisoner, be considered. In pursuing that mode of deciding the case, it would of course be necessary to disregard all the evidence of the prisoner in conflict with the evidence against him. But there is in fact no such conflict as, in any view of the conflicting evidence, could have the effect of reducing the offence below the grade of voluntary manslaughter, if full force and effect be given to the evidence against the prisoner which is consistent with the evidence in his favor.
The court is further of opinion, that the Circuit court did not err in overruling the motion of the prisoner to set aside the verdict, upon the ground that the court had misdirected the jury in regard to the law, in an instruction which the court gave, at the instance and request of the jury. The instruct’on is in these words: “If the jury believe from the evidence *that the deceased and the prisoner were engaged in a sudden and mutual combat, in which no weapon dangerous in itself was used, and during the progress of the fight the prisoner struck the deceased an ordinary blow or blows with his fists or feet, without any intention, either to kill the deceased or to do him any great bodily harm, but to repel his attack, and that the death of the deceased was caused thereby, accidentally and apart from the prisoner’s intention; then the prisoner is guilty of involuntary manslaughter. If, however, though no weapon dangerous in itself was used, but only the fists and feet; yet if the jury are satisfied from the evidence that the manner of inflicting the blows was cruel and unusual, and exceeded in number and violence what was necessary to repel *595 the deceased, and the deceased died of such beating-; then the prisoner is guilty’ of voluntary manslaughter.” An objection is taken to each branch of this instruction - the first, which defines involuntary, and the second, voluntary manslaughter. The objection taken to the first branch is, that it embraces a case of excusable homicide, se defendendo, or by misadventure. The objection is based on the words “to repel his attack,” used in the instruction; and it was contended that a person has a right to repel an attack, using no more force than is necessary for the purpose; and that if death be caused thereby, accidentally and apart from his intention, he is guilty of no offence. “Ror (in the language of writers on criminal law) no man is required by law to remain defenceless, and suffer another to beat him as long as he pleases without resistance, although it be evident that the other does not aim at his life; but he may lawfully exert so much force hs is necessary to compel him to desist. ” Davis’ Or. Taw 78; 1 East P. C. 286. The objection taken to the second branch of the instruction is, that in declaring the prisoner guilty of voluntary manslaughter, *if his ! ’ manner of inflicting the blows was cruel and unusual, and they exceeded in number and violence what was necessary to repel the deceased,” &c., the instruction refers to an actual necessity, and not a necessity reasonably believed by the prisoner to exist.
The court is of opinion, that whatever objection might well be taken to particular words in the instruction, detached from the context, none can properly be taken to the instruction considered altogether. The words “to repel his attack,” are explained by the rest of the instruction ; and especially the commencement of it, which supposes that “the deceased and the prisoner were engaged in a sudden and mutual combat,” and that “during the progress of the fight, the prisoner struck the deceased an ordinary blow,” &c. JBy the very’ terms of the instruction, all idea of self-defence is excluded, blame is imputed to both parties, and certainly to the prisoner, from the beginning to the end of the affray, and he must be guilty at least of manslaughter. The words “to repel his attack,” construed with the context, plainly mean “to maintain the fight,” and might well have been omitted, without altering the sense.— Though, if taken in their literal meaning, they would not, in their connection, render the instruction erroneous. Men engaged in a sudden and mutual combat do not often inflict blows merely to repel the attack of each other. But they may possibly do so; and if, in doing so, one kills the other, he is guilty of manslaughter; because the mutual combat, in the progress of which the mortal blow is given, is an unlawful act. The word “necessary,” in the second branch of the instruction, means reasonably necessary, or what the prisoner, under all the circumstances, might reasonably believe to be necessary. The instruction, however, must be construed in reference to all the circumstances of the case ; and so construed, there cannot be any doubt as to its meaning *or propriety. There was no evidence on either side tending to make out a case of self-defence or misadventure. The whole evidence tended to make out a case of manslaughter at least. The jury were no doubt all satisfied that it was manslaughter; but whether voluntary or involuntary, they were in doubt, or disagreed. They therefore requested the court to define the difference between the two, and the court defined it in reference to the case which the evidence tended to prove; that is, a case in which the homicide is committed in the course of a sudden and mutual combat, by blows inflicted with fists or feet; the court telling the jury, in effect, that in such cases, if the blows were ordinary blows, inflicted without any intention to kill or do great bodily harm, the offence was involuntary manslaughter; but if the blows were cruel and unusual, and excessive in number and violence, the offence was voluntary manslaughter. It does not appear that the prisoner was dissatisfied with this instruction at the time it was given; but the contrary is to be presumed. He did not except to it, nor save the point; but asked the court further to instruct the jury, that if upon the whole evidence they should entertain a reasonable doubt that the deceased came to his death by violence inflicted by the prisoner, then they must acquit him; which further instruction the court gave, in the very words in which it was asked. It cannot be expected that a court, in the hurry’ of a criminal trial, can be always ready to define a crime, or discriminate between the different grades of a crime, in the same accuracy of language which would be used by’ a writer on criminal law. If a party be dissatisfied with an instruction, he ought to state his objections at the time, in order that the court may have an opportunity of removing them. If no objection be made at the time, nor an exception be then taken, or the point saved; but objection be made, for the first time, after ^verdict, and in the form of a motion to set it aside, ihe court will consider whether, under all the circumstances, the party has been prejudiced by the instruction ; and if of opinion that a just verdict has been rendered, according to the law and the evidence, will not set it aside on account of that objection. Viewing the case in that aspect, this court certainly cannot say that the Circuit court erred in refusing to set aside the verdict for misdirection.
The court is further of opinion, that the Circuit court did not err in overruling the motion of the prisoner to set aside the verdict, upon the ground' of the misconduct and irregularity of the jury-. The alleged misconduct is, that McKenna, one of the jury, being of opinion that the prisoner ■was guilty, at most, of involuntary manslaughter, yet concurred in the verdict *596 finding' him guilty of voluntary manslaughter, upon an understanding and agreement with the rest of the jury,, that all would unite in a petition to the governor to pardon him. The only evidence of the said misconduct, is the affidavit of the juror, taken the day after the jurj- had returned their verdict and were discharged, ,and his testimony, and that of seven other jurors, taken three days thereafter in court. It may be conceded, for the purposes of this case, that the said juror, and all who concurred with him in the said understanding and agreement, were guilty of a misdemeanor, for which they were liable to be punished bj' fine and imprisonment. And it may also be conceded, that the alleged misconduct would have been good ground for setting aside the verdict, if it had been established by admissible and sufficient testimony. But the question is, Whether the testimony, of the jurors was sufficient, or even admis-' sible evidence to prove it?
In England, the authorities were formerly unsettled and conflicting on the question, Whether the testimony ^of jurors is admissible to impeach their verdict? The affirmative of the question seems to have been held in Philips v. Fowler, Barnes 441; Parr v. Seames, Id. 438; Millish v. Arnold, Bunb. R. 51; and Aylett v. Jewel, 2 Wm. Black. R. 1299; and the negative, in Prior v. Powers, 1 Keb. R. 811. But in Vaise v. Delaval, 1 T. R. 11, which is considered a leading case on this subject, there was a motion for a rule to set aside a verdict upon an affidavit of two jurors, who swore that the jurjq being divided in their opinion, tossed up, and that the plaintiff’s friends won. Lord Mansfield, Ch. J., said, “The court cannot receive such an affidavit from any of the jurymen themselves, in all of whom such misconduct is a very high misdemeanor; but in every such case the court must derive their knowledge from some other source,” &c. This case was soon followed by Owen v. Warburton, 4 Bos. & Pul. 326, in which Sir James Mansfield, Ch. J., said, “We have conversed with the other judges upon this subject, and we are all of opinion that the affidavit of a juryman cannot be received. It is singular, indeed, that almost the only evidence of which the case admits, should be shut out; but, considering the arts which might be used, if a contrary rule were to prevail, we think it necessary to exclude such evidence. If it were understood to be the law that a juryman might set aside a verdict by such evidence, it might sometimes happen that a juryman, being a friend to one of the parties, and not being able to bring over his companions to his opinion, might propose a decision by lot, with a view after-wards to set aside the verdict by his own affidavit, if the decision should be against him. ’ ’ The last two cases above cited have firmly settled the question in England ; and the practice has never since been changed or shaken.
In the United States, there has been some conflict of judicial opinion upon the question, especially in the earlier cases; but the practice appears to be now ^generally settled, to reject the testi-
mony of jurors when offered to impeach their verdict. The cases on the subject are too numerous to be cited. Most of them were referred to in the argument of this case; and a re also collected and commented upon in 1 Graham & Waterman on New Trials 61-131; 2 Id. 577-594; and 3 Id. 1428-1450. Some of them, and of the English cases, are reviewed in The State v. Freeman, 5 Conn. R. 348, in which Hos-mer, C. J., delivering the opinion of the court, concludes by saying, “The opinion of almost the whole legal world is adverse to the reception of the testimony in question, and in my opinion, on invincible foundations.” In Johnson v. Davenport, 3 J. J. Marsh. R. 390, the court, in refusing a new trial, said, “The testimony of one or more of the jurors, to prove such misconduct of the jury as would invalidate their verdict or to question the purity of the motives by which they had been influenced in rendering it, or to explain the ground either of law or fact which influenced them, with a view to impeach the verdict which they had returned, is inadmissible, according to the whole current of modern decisions. The dangerous tendency of receiving testimony of the jurors for such a purpose, is too obvious to require comment.” “It is indeed very difficult (the court further said) to lay down any precise rule, the application of which to each particular case would be sufficient to determine whether the affidavits of the jurors ought to be received to invalidate their verdict. It seems to be universally ag-reed, that if received at all, it should be with great caution ; and we are of opinion that their admissibility should be confined to cases of mistake clearly made out, and which maybe conceded as true, without subjecting the jury to anj- imputation of impure motives or palpable impropriety of conduct, and in relation to the proof of which there should be no reasonable ground for suspicion *that they might have been tampered with.” Tennessee, it is believed, is the only state in which it is now considered as settled that the testimony of jurors is admissible, and may be sufficient evidence of their misconduct to set aside their verdict. It was so held in an early case, Crawford v. The State, 2 Yerg. R. 60 (a case very similar in its "features to this) ; which has been since followed in other cases, and especially in Cochran v. The State, 7 Humph. R. 544. But in Hudson’s Case, 9 Yerg. R. 408, the court said, “It is a dangerous principle, and we are not disposed to extend it one step beyond what it has already been carried.” And in Norris v. The State, 3 Humph. R. 333, the court adhering to that view, examined the prior cases, to ascertain how far the principle had been carried, and modified the rule accordingly.
In Virginia, the practice has never been settled. In several cases applications have *597 been made to set aside verdicts on the testimony oí jurors; and in one or two cases the application has prevailed. But in the latter, the testimony tended to prove mere mistake, and not misconduct of the jury. In most of the cases, the court referred to the danger of receiving- such testimony, and the great caution with which it ought to be received, if at all. In Cochran v. Street, Wash. 79, the jury were divided in opinion; but the minority, believing that the opinion of the majority was to prevail, therefore concurred in the verdict. The court admitted that “to meddle with the verdict of the jury upon the evidence of some of the jurors, is a delicate business, and should be proceeded in with caution, to prevent the mischief of the jurymen being tampered with;” and referred with approbation to the decision of Cord Mansfield in Vaise v. Delaval, 1 T. R. 11; but as il was clear that the verdict was found under a mistake (the fact having been proved by a large majority of the jury, and denied by none of *them, and it not appearing that there had been any tampering with them to obtain the information), the court awarded a new trial. That case was decided in 1792, when the practice was more unsettled than it now is. Since then, the tendency of judicial opinion has been more and more in favor of the exclusion of such testimony. Whether, if that were a new case, it would now be decided in the same way, is at least a doubtful question. But it rests entirely on the ground of an innocent mistake, clearly proved, showing that the verdict was never assented to by all the jurors, and was not in truth their verdict. In Bridge v. Eggleston, 14 Mass. R. 245, a similar case was decided otherwise. In Price’s ex’or v. Fauqua’s adm’r, 1 Hen. & Munf. 385, the court unanimously affirmed the judgment of the District court, refusing a new trial, on the affidavits of two of the jurors that they were alone influenced in finding for the plaintiff, by a fact stated in the jury room by one of f he jury ; the ground assigned for such refusal being “because it would be dangerous to admit a new trial on such information from the jurymen, and the new trial would be against the justice of the case.” In Shobe v. Bell, 1 Rand. 39, one of the grounds of a motion for a new trial was that three of the jury were influenced to concur in the verdict bjr improper motives; and this ground was sustained by the affidavits of four of the jury. The Superior court overruled the motion, and this court affirmed the judgment. In Moffett v. Bowman, 6 Gratt. 219, a motion was made for a new trial, founded on the affidavit of nine of the jurors, stating that the verdict, as returned and recorded, did not contain the verdict which they intended to render, and that the same was returned by them under a mistake as to its legal effect. The manner in which the mistake was made was also stated in the affidavit. The Circuit court overruled the motion. This court, being of opinion, '"“from the evidence adduced on the motion for a new trial (which evidence was, under the circumstances, properly received by the Circuit court), that the intention of the jury was not accomplished by their verdict, and not being satisfied with the verdict on the merits, reversed the judgment, and awarded a new trial. In Hanabarger’s adm’r v. Kinney, Id. 287, the verdict was set aside conditionally by the Circuit court, upon the evidence of some of the jury that they had been induced to concur in the verdict by a misunderstanding of an instruction of the court. This court reversed the judgment, being of opinion, “that to permit a verdict, which, in the opinion of the; court that tried the cause was not contrary to the evidence, and by which, for ought that appears to this court, full justice was done, to be set aside upon the evidence of a few' of the jurors, made under the circumstances described by the record, respecting their understanding of an instruction of the court upon questions of law raised at the trial, would lead to dangerous consequences, as holding out inducements to tamper with the jurors, after they had dispersed, and may have forgotten the circumstances which did actually occur.” In Thompson’s Case, 8 Gratt. 637, the court waived the decision of the question as to the competency of 1he evidence of jurors to impeach or invalidate their own verdict (it not being necessary in that case to decide it), but took occasion to say, “The question is now well settled in England against the competency, and the great preponderance of American authority is the same way.” In Koiner v. Rankin’s heirs, 11 Gratt. 420, Judge Dee, in his opinion, in which the other judges concurred, remarks, that “while affidavits of jurors will generally be received in support of the verdict, they will not readily be received to invalidate it.” “The leaning of the courts of most approved authority is against the practice of grounding *motions for new trials upon them; and a disposition has been manifested, greatly to restrict the class of cases in which, upon such affidavits, new trials will be allowed.”
In view of all the authorities, and of the reason on which they are founded, we think that, as a general rule, the testimony of jurors ought not to be received to impeach their verdict, especially on the ground of their own misconduct. And, without intending to decide that there are no exceptions to the rule, we think that even in cases in which the testimony may be admissible, it ought to be received with ver3' great caution. A contrary rule would hold out to unsuccessful parties and their friends, the strongest temptation to tamper with jurors after their discharge, and would other-wise be productive of the greatest evils. A corrupt juror, wishing to favor one of the parties, ¿light propose to decide the case by lot, knowing that he could have the verdict set aside if it did not suit him: Or, wishing to insure the discharge of a prisoner tried for felony, might refuse to concur with the other jurors in finding a true verdict of guilty, unless they would unite with him In a petition *598 for a pardon, believing that he could have the verdict set aside if the pardon were refused. In almost every case, especially every case of felony in which the jury is kept together for several days, a plausible ground might be shown for setting aside the verdict; upon the sufficiency of which the court would have to decide according to its own discretion. Thus, the value of jury trial .would be greatly impaired, and the whole administration of justice dependent upon if would be involved in the most painful uncertainty. A juror who comes forward to impeach his verdict on the ground of his own misconduct, has little or no claim to our credit; and the safest general rule is to shut the door against him. A person convicted of perjury is an incompetent witness. *Why not a juror who denies the truth of his verdict; and, if his denial be true, thereby convicts himself of the highest moral, if not legal perjury? The verdict is surely the best evidence of his opinion of the case; and he at least should not be permitted, as a general rule, to impeach it. Little or no evil can result from the exclusion of his testimony: none in comparison with the great evils which would result from its admission. The verdict is rendered in open court, and in cases of felony, necessarily in the presence of the prisoner. The jury may be polled, and ought to be, if there is the least doubt of the free concurrence of all the jury in the verdict. In that way, any difficulty or disagreement which may be among them, can generally be discovered. In that way, it was discovered in Harden’s Case, 3 Bailey’s R. 3, that four of the jurors dissented from the verdict. In that way, doubtless, the same discovery might have been made in Cochran v. Street, 1 Wash. 79; and in the same way, it might have been discovered in Johnson v. Davenport, 3 J. J. Marsh. R. 390, that one of the jurors dissented from the verdict: for he stated in his affidavit, “that if his name had been called and he asked whether he agreed to the verdict, he would have answered in the negative.” Is it not more reasonable that this easy legal precaution should be used, than that affidavits should be obtained of the jurors after their discharge, and made the foundation of a motion for a new trial? Again: the court, if not satisfied with the verdict, may and ought to set it aside. And if it improperly refuse to do so, the appellate court may revise and reverse the judgment. So there can be little or no danger that injustice will arise from the operation of the general rule in question.
The court is of opinion, that this case falls under the general rule, and not under any exception to it, and that the testimony of the jurors is not sufficient *br admissible evidence to prove their alleged misconduct, gross as it undoubtedly was. It is not pretended that the verdict was founded on any mistake. The jury all concurred in it, perfectly understood its meaning and effect, and intended that it should operate accordingly. The Circuit court was satisfied with the verdict, as being, sustained by the law and the evidence ; and this court concurs in that opinion. We therefore think the Circuit court was right in refusing to set aside the verdict on the ground of the misconduct and irregularity of the jury.
Upon the whole, the court is of opinion that there is no ex-ror in the judg-ment, and that it be affirmed.
Judgment affirmed.